**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **J.S., a Minor, by her Mother and Next Friend LACRETIA SPRINGFIELD,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **vs.** | ) ) | |
| **WHITESIDE SCHOOL DISTRICT #115, NATHAN RAKERS, PEGGY BURKE,** | ) ) ) ) | **Case No.: 3:19-cv-782** **JURY TRIAL DEMANDED ON ALL COUNTS** |
| **Defendants.** | ) ) ) | |

## **COMPLAINT**

### **COUNT I**
**(Deprivation of Rights under 20 U.S.C. § 1681 [Title IX of the Education Amendments of 1972] v. Whiteside School District #115)**

Comes now Plaintiff, J.S., a Minor, by and through her Mother and Next Friend, Lacretia Springfield, by and through her attorneys, Crowder & Scoggins, Ltd., and for Count I of her Complaint against Defendant Whiteside School District #115, states as follows:

1.      This is a claim pursuant to the private right of action under Title IX of the Education Amendments of 1972.   The jurisdiction of this Court is invoked to secure the protection of civil rights under Title IX.

2.      Lacretia Springfield is the natural mother of J.S., is a resident of the State of Illinois and the County of St. Clair, and has been such at all times relevant to this Complaint.

3.      During the summer months of 2017, J.S., an eight-year-old girl, attended the Summer of Academics and Recreation ("S.O.A.R.") camp, which was organized, staffed, supervised and controlled by Defendant Whiteside School District #115 (hereinafter referred to as "Whiteside").

1

4.      On multiple occasions during the S.O.A.R. camp, J.S. was a victim of sexual harassment, sexual abuse, and sexual battery perpetrated by another student participating at the camp.  These events included, but were not limited to:

   a.   Being kissed by another female student on the mouth and other places on her body;

   b.   Being touched on the genitals in the gym, on the bus, and on field trips by another student; and

   c.   Being told by the student that she would "beat her up" if she told anyone about the sexual harassment, sexual abuse, and sexual battery.

5.      These events of harassment, abuse, and battery would occur regularly, but especially on Fridays, which were "Movie Days".  On these days, S.O.A.R. participants were allowed to bring sleeping bags, pillows, and blankets from home to use while watching a movie at camp.  Upon information and belief, at most two non-certified staff members were present supervising the children.  Two and sometimes three children would be in the same sleeping bags or blankets at the same time.

6.      The abuse reached the point of J.S. dreading Fridays at S.O.A.R. camp because of the likelihood of being sexually harassed, sexually abused, and sexually battered by the other student.

7.      The foregoing acts of peer sexual harassment were severe, pervasive, and objectively offensive.

8.      J.S. was not the only victim of this sexual violence, and one of the other victims reported it to S.O.A.R. personnel on or about August 15, 2017.

2

9.      Upon receiving the report, the Director of S.O.A.R. conducted interviews of the children believed to be perpetrators and victims of the sexual violence, and the matter was reported to the elementary school principal, Mr. Nathan Rakers.

10.     The foregoing demonstrates Whiteside's actual knowledge of the severe, pervasive, and objectively offensive sexual violence being perpetrated upon J.S.

11.     Despite this knowledge, Mr. Rakers took no action to notify any parents until August 29, 2017, the date on which Lacretia Springfield confronted Mr. Rakers about the issue. Mr. Rakers still did not notify any other parents at that time.

12.     Mr. Rakers did not notify the Illinois Department of Child and Family Services or local law enforcement until August 29, 2017.

13.     Upon information and belief, Mr. Rakers never consulted Whiteside's Title IX coordinator, and none of the victims were ever referred to the coordinator.

14.     Whiteside conducted no investigation as it is obligated to conduct under Title IX.

15.     The matter was reported to local media, and after such reporting, more minor students that were involved disclosed information to their parents, who in turn contacted Whiteside.

16.     Still, Whiteside conducted no Title IX investigation, no remedial services were offered, no information that was reasonably appropriate was disseminated, and Whiteside took no action to prevent future occurrences of sexual abuse or remediate the abuse that had occurred.

17.     The only action Whiteside took was to allow the alleged perpetrator to move to the middle school campus (which would have happened in the absence of such abuse) while J.S. returned to the elementary school campus.  J.S. was also advised that the alleged perpetrator would be under a "school supervision" plan while at school and on the bus.

18.     Upon Plaintiff's request through her counsel that remedial measures be taken by Whiteside, the response was that the alleged perpetrator would be attending classes at the middle school campus, and not the elementary campus.

19.     No other remedial measures were offered, and no efforts were made to ameliorate the hostile environment created for J.S. by the sexual violence.

20.     J.S. would have attended classes at the middle school campus the next school year.

21.     The above failure to act by Whiteside demonstrates a deliberate indifference to the effects the severe, pervasive, and objectively offensive sexual violence had upon J.S.

22.     The sexual violence perpetrated upon J.S. caused her severe stress, anxiety, and other mental and emotional distress.  This distress manifested itself in many ways including, but not limited to, J.S. losing hair.

23.     Returning to Whiteside without any supportive structure in place impacted J.S.'s mental and physical health, which impeded her access to educational benefits at Whiteside.

24.     As a result, J.S. was removed from Whiteside, home-schooled for a period of time, eventually established residency in another District, and attends school there to this day.

25.     The above actions and inactions of Defendant establish that Defendant had actual knowledge of sexual violence perpetrated upon J.S. and were deliberately indifferent to the denial of equal access to education resulting therefrom.  Whiteside's lack of a prompt response and complete absence of offering any remedial measures were clearly unreasonable in light of the circumstances of which it was aware.

26.     As a direct and proximate consequence and result of Defendant's actions and omissions stated above, J.S. was denied equal access to education, and has suffered serious personal injuries in both mind and body.

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment for Plaintiff as follows:

      a.  Compensatory damages in favor of J.S. for being denied equal access to education and for her injuries and mental and physical anguish suffered;

      b.  Reimbursement of costs and expenditures and reasonable counsel fees pursuant to 42 U.S.C. § 1988; and

      c.  Any other appropriate relief that is just and equitable to compensate J.S.

## COUNT II
### (Deprivation of Constitutional Rights under 42 U.S.C. § 1983 v. Nathan Rakers)

Comes now Plaintiff, J.S., a Minor, by and through her Mother and Next Friend, Lacretia Springfield, by and through her attorneys, Crowder & Scoggins, Ltd., and for Count II of her Complaint against Defendant Nathan Rakers, states as follows:

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.  This is a suit at law, requiring the imposition of money damages under 42 U.S.C. § 1983. The jurisdiction of this Court is invoked to secure the protection of civil rights and to address the deprivation of rights secured by the Fourteenth Amendment to the United States Constitution.

2.      Lacretia Springfield is the natural mother of J.S., is a resident of the State of Illinois and the County of St. Clair, and has been such at all times relevant to this Complaint.

3.      At all times relevant to this Complaint, Defendant Nathan Rakers was acting in the course and scope of his employment, was operating under color of law and in his individual capacity.

4.      During the summer months of 2017, J.S., an eight-year-old girl, attended the Summer of Academics and Recreation ("S.O.A.R.") camp, which was organized, staffed, supervised and controlled by Defendant Whiteside School District #115 (hereinafter referred to as "Whiteside").

5.      On multiple occasions during the S.O.A.R. camp, J.S. was a victim of sexual harassment, sexual abuse, and sexual battery perpetrated by another student participating at the camp.  These events included, but were not limited to:

        A.  Being kissed by another female student on the mouth and other places on her body;

        B.  Being touched on the genitals in the gym, on the bus, and on field trips by another student; and

        C.  Being told by the student that she would "beat her up" if she told anyone about the sexual harassment, sexual abuse, and sexual battery.

6.      These events of harassment, abuse, and battery would occur regularly, but especially on Fridays, which were "Movie Days".  On these days, S.O.A.R. participants were allowed to bring sleeping bags, pillows, and blankets from home to use while watching a movie at camp.  Upon information and belief, at most two non-certified staff members were present supervising the children.  Two and sometimes three children would be in the same sleeping bags or blankets at the same time.

7.      The abuse reached the point of J.S. dreading Fridays at S.O.A.R. camp because of the likelihood of being sexually harassed, sexually abused, and sexually battered by the other student.

8.    The foregoing acts of peer sexual harassment were severe, pervasive, and objectively offensive.

9.    J.S. was not the only victim of this sexual violence, and one of the other victims reported it to S.O.A.R. personnel on or about August 15, 2017.

10.    Upon receiving the report, the Director of S.O.A.R. conducted interviews of the children believed to be perpetrators and victims of the sexual violence, and the matter was reported to the elementary school principal, Defendant Nathan Rakers.

11.    The foregoing demonstrates Defendant Rakers' actual knowledge of the severe, pervasive, and objectively offensive sexual violence being perpetrated upon J.S.

12.    Despite this knowledge, Mr. Rakers took no action to notify any parents until August 29, 2017, the date on which Lacretia Springfield confronted Mr. Rakers about the issue. Mr. Rakers still did not notify any other parents at that time.

13.    Defendant Rakers did not notify the Illinois Department of Child and Family Services or local law enforcement until August 29, 2017.

14.    The matter was reported to local media, and after such reporting, more minor students that were involved disclosed information to their parents, who in turn contacted Whiteside.

15.    Still, no remedial services were offered, no information that was reasonably appropriate was disseminated, and Defendant Rakers took no action to prevent future occurrences of sexual abuse, or remediate the abuse that had occurred.

16.    The only action Defendant Rakers took was to allow the alleged perpetrator to move to the middle school campus (which would have happened in the absence of such abuse)

while J.S. returned to the elementary school campus.  J.S. was also advised that the alleged perpetrator would be under a "school supervision" plan while at school and on the bus.

17.     No other remedial measures were offered, and no efforts were made to ameliorate the hostile environment created for J.S. by the sexual violence.

18.     J.S. would have attended classes at the middle school campus the next school year.

19.     The sexual violence perpetrated upon J.S. caused her severe stress, anxiety, and other mental and emotional distress.  This distress manifested itself in many ways including, but not limited to, J.S. losing hair.

20.     Returning to Whiteside without any supportive structure in place impacted J.S.'s mental and physical health, which impeded her access to educational benefits at Whiteside.

21.     As a result, J.S. was removed from Whiteside, home-schooled for a period of time, eventually established residency in another District, and attends school there to this day.

22.     The above actions and inactions of Defendant Rakers establish that Defendant Rakers had actual knowledge of sexual violence perpetrated upon J.S., and was deliberately indifferent to the denial of equal access to education resulting therefrom.  Defendant Rakers' lack of a prompt response and complete absence of offering any remedial measures was clearly unreasonable in light of the circumstances of which he was aware.

23.     Defendant's deliberate indifference to the sexual harassment, sexual abuse, and sexual battery, as alleged herein, resulted in discrimination against J.S. based on her being female, which denied J.S. equal protection of the laws.

24.     As a result of the above referenced actions, J.S. was subjected to deprivation by Defendant Rakers, acting under color of law, of the rights, privileges, and immunities secured to her by the Fourteenth Amendment to the United States Constitution.

25.     The foregoing acts and omissions demonstrate a reckless and callous indifference to the rights of J.S.

26.     As a direct and proximate consequence and result of Defendant's actions and omissions stated above, J.S. was denied equal access to education, equal protection of the law, has suffered, and continues to suffer, anxiety and humiliation, mental anguish, emotional distress, and has had to expend a substantial amount of time and money in order to protest her unconstitutional deprivations.  Plaintiff has further spent and become liable and will continue to spend and become liable for large sums of money for medical treatment and services attempting to heal and cure her injuries.

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment for Plaintiff as follows:

A. Compensatory damages in favor of J.S. for being denied equal access to education and for her injuries and mental and physical anguish suffered;

B. Punitive and exemplary damages to punish and deter Defendant Nathan Rakers;

C. Reimbursement of costs and expenditures and reasonable counsel fees pursuant to 42 U.S.C. § 1988; and

D. Any other appropriate relief that is just and equitable to compensate J.S.

### COUNT III
**(Deprivation of Constitutional Rights under 42 U.S.C. § 1983 v. Peggy Burke)**

Comes now Plaintiff, J.S., a Minor, by and through her Mother and Next Friend, Lacretia Springfield, by and through her attorneys, Crowder & Scoggins, Ltd., and for Count III of her Complaint against Defendant Peggy Burke, states as follows:

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.  This is a suit at law, requiring the imposition of money damages under 42 U.S.C. § 1983. The jurisdiction of this Court is invoked to secure the protection of civil rights and to address the deprivation of rights secured by the Fourteenth Amendment to the United States Constitution.

2.      Lacretia Springfield is the natural mother of J.S., is a resident of the State of Illinois and the County of St. Clair, and has been such at all times relevant to this Complaint.

3.      At all times relevant to this Complaint, Defendant Peggy Burke was acting in the course and scope of her employment, was operating under color of law and in her individual capacity.

4.      During the summer months of 2017, J.S., an eight-year-old girl, attended the Summer of Academics and Recreation ("S.O.A.R.") camp, which was organized, staffed, supervised and controlled by Defendant Whiteside School District #115 (hereinafter referred to as "Whiteside").

5.      On multiple occasions during the S.O.A.R. camp, J.S. was a victim of sexual harassment, sexual abuse, and sexual battery perpetrated by another student participating at the camp.  These events included, but were not limited to:

      A.  Being kissed by another female student on the mouth and other places on her body;

      B.  Being touched on the genitals in the gym, on the bus, and on field trips by another student; and

C.  Being told by the student that she would "beat her up" if she told anyone about the sexual harassment, sexual abuse, and sexual battery.

6.     These events of harassment, abuse, and battery would occur regularly, but especially on Fridays, which were "Movie Days".  On these days, S.O.A.R. participants were allowed to bring sleeping bags, pillows, and blankets from home to use while watching a movie at camp.  Upon information and belief, at most two non-certified staff members were present supervising the children.  Two and sometimes three children would be in the same sleeping bags or blankets at the same time.

7.     The abuse reached the point of J.S. dreading Fridays at S.O.A.R. camp because of the likelihood of being sexually harassed, sexually abused, and sexually battered by the other student.

8.     The foregoing acts of peer sexual harassment were severe, pervasive, and objectively offensive.

9.     J.S. was not the only victim of this sexual violence, and one of the other victims reported it to S.O.A.R. personnel on or about August 15, 2017.

10.    Upon receiving the report, the Director of S.O.A.R. conducted interviews of the children believed to be perpetrators and victims of the sexual violence, and the matter was reported to the elementary school principal, Mr. Nathan Rakers.

11.    Upon information and belief, Mr. Rakers made Defendant Peggy Burke aware of the matter.

12.    The foregoing demonstrates Defendant Burke's actual knowledge of the severe, pervasive, and objectively offensive sexual violence being perpetrated upon J.S.

13.     Despite this knowledge, Defendant Burke took no action to notify any parents, or cause any parents to be notified.

14.     Defendant Burke did not cause anyone to notify the Illinois Department of Child and Family Services or local law enforcement until August 29, 2017.

15.     The matter was reported to local media, and after such reporting, more minor students that were involved disclosed information to their parents, who in turn contacted Whiteside.

16.     Still, no remedial services were offered, no information that was reasonably appropriate was disseminated, and Defendant Burke took no action to prevent future occurrences of sexual abuse, or remediate the abuse that had occurred.

17.     The only action Defendant Burke took was to allow the alleged perpetrator to move to the middle school campus (which would have happened in the absence of such abuse) while J.S. returned to the elementary school campus.  J.S. was also advised that the alleged perpetrator would be under a "school supervision" plan while at school and on the bus.

18.     Upon Plaintiff's request through her counsel that remedial measures be taken by Defendant Burke, the response was that the alleged perpetrator would be attending classes at the middle school campus, and not the elementary campus.

19.     No other remedial measures were offered, and no efforts were made to ameliorate the hostile environment created for J.S. by the sexual violence.

20.     J.S. would have attended classes at the middle school campus the next school year.

21.     The sexual violence perpetrated upon J.S. caused her severe stress, anxiety, and other mental and emotional distress.  This distress manifested itself in many ways including, but not limited to, J.S. losing hair.

22.     Returning to Whiteside without any supportive structure in place impacted J.S.'s mental and physical health, which impeded her access to educational benefits at Whiteside.

23.     As a result, J.S. was removed from Whiteside, home-schooled for a period of time, eventually established residency in another District, and attends school there to this day.

24.     The above actions and inactions of Defendant Burke establish that Defendant had actual knowledge of sexual violence perpetrated upon J.S., and was deliberately indifferent to the denial of equal access to education resulting therefrom.  Defendant Burke's lack of a prompt response and complete absence of offering any remedial measures was clearly unreasonable in light of the circumstances of which it was aware.

25.     Defendant Burke's deliberate indifference to the sexual harassment, sexual abuse, and sexual battery, as alleged herein, resulted in discrimination against J.S. based on her being female, which denied J.S. equal protection of the laws.

26.     As a result of the above referenced actions, J.S. was subjected to deprivation by Defendant Burke, acting under color of law, of the rights, privileges, and immunities secured to her by the Fourteenth Amendment to the United States Constitution.

27.     The foregoing acts and omissions demonstrate a reckless and callous indifference to the rights of J.S.

28.     As a direct and proximate consequence and result of Defendant Burke's actions and omissions stated above, J.S. was denied equal access to education, has suffered, and continues to suffer, anxiety and humiliation, mental anguish, emotional distress, and has had to

expend a substantial amount of time and money in order to protest her unconstitutional deprivations.  Plaintiff has further spent and become liable and will continue to spend and become liable for large sums of money for medical treatment and services attempting to heal and cure her injuries.

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment for Plaintiff as follows:

A.   Compensatory damages in favor of J.S. for being denied equal access to education and for her injuries and mental and physical anguish suffered;

B.   Reimbursement of costs and expenditures and reasonable counsel fees pursuant to 42 U.S.C. § 1988;

C.   Punitive and exemplary damages to punish and deter Defendant Peggy Burke; and

D.   Any other appropriate relief that is just and equitable to compensate J.S.

## COUNT IV
### (Deprivation of Constitutional Rights under 42 U.S.C. § 1983 v. Whiteside School District #115)

Comes now Plaintiff, Lacretia Springfield, as Mother and Next Friend of J.S., a Minor, by and through her attorneys, Crowder & Scoggins, Ltd., and for Count IV of her Complaint against Defendant Whiteside School District #115, states as follows:

1.      Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.  This is a suit at law, requiring the imposition of money damages under 42 U.S.C. § 1983. The jurisdiction of this Court is invoked to secure the protection of civil rights and to address the deprivation of rights secured by the Fourteenth Amendment to the United States Constitution.

2.      Lacretia Springfield is the natural mother of J.S., is a resident of the State of Illinois and the County of St. Clair, and has been such at all times relevant to this Complaint.

3.      At all times relevant to this Complaint, Defendants Nathan Rakers and Peggy Burke were acting in the course and scope of their employment, were operating under color of law and in their official capacity, and were final policymaking authorities for Whiteside School District #115.

4.      During the summer months of 2017, J.S., an eight-year-old girl, attended the Summer of Academics and Recreation ("S.O.A.R.") camp, which was organized, staffed, supervised and controlled by Defendant Whiteside School District #115 (hereinafter referred to as "Whiteside").

5.      On multiple occasions during the S.O.A.R. camp, J.S. was a victim of sexual harassment, sexual abuse, and sexual battery perpetrated by another student participating at the camp.  These events included, but were not limited to:

A.  Being kissed by another female student on the mouth and other places on her body;

B.  Being touched on the genitals in the gym, on the bus, and on field trips by another student; and

C.  Being told by the student that she would "beat her up" if she told anyone about the sexual harassment, sexual abuse, and sexual battery.

6.      These events of harassment, abuse, and battery would occur regularly, but especially on Fridays, which were "Movie Days".  On these days, S.O.A.R. participants were allowed to bring sleeping bags, pillows, and blankets from home to use while watching a movie at camp.  Upon information and belief, at most two non-certified staff members were present supervising the children.  Two and sometimes three children would be in the same sleeping bags or blankets at the same time.

7.     The abuse reached the point of J.S. dreading Fridays at S.O.A.R. camp because of the likelihood of being sexually harassed, sexually abused, and sexually battered by the other student.

8.     The foregoing acts of peer sexual harassment were severe, pervasive, and objectively offensive.

9.     J.S. was not the only victim of this sexual violence, and one of the other victims reported it to S.O.A.R. personnel on or about August 15, 2017.

10.     Upon receiving the report, the Director of S.O.A.R. conducted interviews of the children believed to be perpetrators and victims of the sexual violence, and the matter was reported to the elementary school principal, Mr. Nathan Rakers.

11.     Upon information and belief, Mr. Rakers made Defendant Peggy Burke aware of the matter.

12.     The foregoing demonstrates Mr. Rakers' and Ms. Burke's actual knowledge of the severe, pervasive, and objectively offensive sexual violence being perpetrated upon J.S.

13.     Despite this knowledge, Whiteside took no action to notify any parents until August 29, 2017, the date on which Lacretia Springfield confronted Mr. Rakers about the issue. Whiteside still did not notify any other parents at that time.

14.     Whiteside did not notify the Illinois Department of Child and Family Services or local law enforcement until August 29, 2017.

15.     Upon information and belief, neither Mr. Rakers nor Ms. Burke consulted Whiteside's Title IX coordinator, and none of the victims were ever referred to the coordinator.

16.     The matter was reported to local media, and after such reporting, more minor students that were involved disclosed information to their parents, who in turn contacted Whiteside.

17.     Still, Whiteside offered no remedial services, did not disseminate information that was reasonably appropriate, and took no action to prevent future occurrences of sexual abuse, or remediate the abuse that had occurred.

18.     The only action Whiteside took was to allow the alleged perpetrator to move to the middle school campus (which would have happened in the absence of such abuse) while J.S. returned to the elementary school campus.  J.S. was also advised that the alleged perpetrator would be under a "school supervision" plan while at school and on the bus.

19.     Upon Plaintiff's request through her counsel that remedial measures be taken by Whiteside, the response was that the alleged perpetrator would be attending classes at the middle school campus, and not the elementary campus.

20.     No other remedial measures were offered, and no efforts were made to ameliorate the hostile environment created for J.S. by the sexual violence.

21.     J.S. would have attended classes at the middle school campus the next school year.

22.     The above failure to act by Whiteside demonstrates a deliberate indifference to the effects the severe, pervasive, and objectively offensive sexual violence had upon J.S.

23.     The sexual violence perpetrated upon J.S. caused her severe stress, anxiety, and other mental and emotional distress.  This distress manifested itself in many ways including, but not limited to, J.S. losing hair.

24.     Returning to Whiteside without any supportive structure in place impacted J.S.'s mental and physical health, which impeded her access to educational benefits at Whiteside.

25.     As a result, J.S. was removed from Whiteside, home-schooled for a period of time, eventually established residency in another District, and attends school there to this day.

26.     The above actions and inactions of Defendant establish that Defendant had actual knowledge of sexual violence perpetrated upon J.S., and were deliberately indifferent to the denial of equal access to education resulting therefrom.   Whiteside's lack of a prompt response and complete absence of offering any remedial measures was clearly unreasonable in light of the circumstances of which it was aware.

27.     Defendant's deliberate indifference to the sexual harassment, sexual abuse, and sexual battery, as alleged herein, resulted in discrimination against J.S. based on her being female, which denied J.S. equal protection of the laws.

28.     As a result of the above referenced actions, J.S. was subjected to deprivation by Whiteside, through its final policymaking authorities, acting under color of law, of the rights, privileges, and immunities secured to her by the Fourteenth Amendment to the United States Constitution; particularly her right to equal protection of the laws.

29.     The actions and inactions of Mr. Rakers and Ms. Burke were part of a policy, practice or custom established or ratified by Whiteside School District #115.

30.     As a direct and proximate consequence and result of Defendant's actions and omissions stated above, J.S. was denied equal access to education, has suffered, and continues to suffer, anxiety and humiliation, mental anguish, emotional distress, and has had to expend a substantial amount of time and money in order to protest her unconstitutional deprivations.   J.S.

has further spent and become liable and will continue to spend and become liable for large sums of money for medical treatment and services attempting to heal and cure her injuries.

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment for Plaintiff as follows:

      A.  Compensatory damages in favor of J.S. for being denied equal access to education and for her injuries and mental and physical anguish suffered;

      B.  Reimbursement of costs and expenditures and reasonable counsel fees pursuant to 42 U.S.C. § 1988; and

      C.  Any other appropriate relief that is just and equitable to compensate J.S.

## COUNT V
### (Negligence v. Whiteside School District #115)

Comes now Plaintiff, Lacretia Springfield, as Mother and Next Friend of J.S., a Minor, by and through her attorneys, Crowder & Scoggins, Ltd., and for Count V of her Complaint against Defendant Whiteside School District #115, states as follows:

1.    Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1367(a).

2.    Lacretia Springfield is the natural mother of J.S., is a resident of the State of Illinois and the County of St. Clair, and has been such at all times relevant to this Complaint.

3.    At all times relevant to this Complaint, Defendant Nathan Rakers, and the staff supervising and overseeing the Summer of Academics and Recreation ("S.O.A.R.") camp were acting in the course and scope of their employment for Whiteside School District #115.

4.    During the summer months of 2017, J.S., an eight-year-old girl, attended the S.O.A.R. camp, which was organized, staffed, supervised and controlled by Defendant Whiteside School District #115 (hereinafter referred to as "Whiteside").

5.      On multiple occasions during the S.O.A.R. camp, J.S. was a victim of sexual harassment, sexual abuse, and sexual battery perpetrated by another student participating at the camp.  These events included, but were not limited to:

        A.   Being kissed by another female student on the mouth and other places on her body;

        B.   Being touched on the genitals in the gym, on the bus, and on field trips by another student; and

        C.   Being told by the student that she would "beat her up" if she told anyone about the sexual harassment, sexual abuse, and sexual battery.

6.      These events of harassment, abuse, and battery would occur regularly, but especially on Fridays, which were "Movie Days".  On these days, S.O.A.R. participants were allowed to bring sleeping bags, pillows, and blankets from home to use while watching a movie at camp.  Upon information and belief, at most two non-certified staff members were present supervising the children.  Two and sometimes three children would be in the same sleeping bags or blankets at the same time.

7.      The sexual abuse of the children at S.O.A.R., including J.S., was so pervasive that Defendant had knowledge of the abuse, or, through recklessness or carelessness, failed to discover the abuse when it could have been discovered through ordinary care.

8.      At all times relevant to this Complaint, Defendants had a duty to supervise the children under its care and control, to exercise reasonable care to protect the children from sexual harassment, sexual battery, and sexual abuse while those children participated in a school-sponsored program, and to refrain from willful and wanton conduct in the supervision of the children participating in the S.O.A.R. program.

9.      Despite said duty, Defendant willfully and wantonly failed to supervise the children in the S.O.A.R. program to prevent the sexual battery, harassment, and abuse suffered by J.S., and others; and Defendant otherwise acted willfully and wantonly in the supervision of S.O.A.R.

10.      The aforementioned acts, failures, and omissions of Defendant constitute a willful and wanton disregard for the safety of J.S., and others lawfully on the premises.

11.      The sexual violence perpetrated upon J.S. caused her severe stress, anxiety, and other mental and emotional distress.  This distress manifested itself in many ways including, but not limited to, J.S. losing hair.

12.      As a direct and proximate result of Defendant's willful and wanton conduct, J.S. sustained serious personal injuries.  J.S. has also suffered a great deal of pain and anguish, in both mind and body, and will continue to suffer in the future.  J.S. has further spent and become liable, and will continue to spend and become liable, for large sums of money for medical care and services attempting to heal and cure her injuries.

WHEREFORE, Plaintiff respectfully prays that the Court enter judgment for Plaintiff for damages, plus the costs of this action, and for such other and further relief the Court deems just and equitable.

**JURY TRIAL DEMANDED ON ALL COUNTS**

CROWDER & SCOGGINS, LTD.

_____s/ Anthony P. Gilbreth_____
Clay B. St. Clair #6273497
Anthony P. Gilbreth #6289576
Attorneys for Plaintiffs

CROWDER & SCOGGINS, LTD.
Attorneys at Law
121 West Legion Avenue
P.O. Box 167
Columbia, Illinois  62236
Telephone:  618/281-7111
Facsimile:  618/281-7115
CStClair@crowderscoggins.com
AGilbreth@crowderscoggins.com